**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SOPHIE P. TOULON, and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 15 CV 138 |
| CONTINENTAL CASUALTY COMPANY, | ) ) ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## I.    INTRODUCTION

This is plaintiff's third bite at the apple in this case.  For the reasons set forth below, Continental Casualty Company ("Continental") again respectfully asks the Court to dismiss, this time with prejudice, plaintiff's unmeritorious claims against it.

In 2002, plaintiff purchased a long-term care insurance policy from Continental that, by its plain terms and as admitted by plaintiff, provided premiums subject to change.  The first page of plaintiff's policy stated, in bold and capital font, **"PREMIUMS SUBJECT TO CHANGE**."  Plaintiff was 68 years old at the time she purchased her policy, which had an initial premium of $1,671.84 that was guaranteed fixed for the next ten years pursuant to a rate-guarantee rider to the policy.  In 2013, eleven years after plaintiff purchased the policy and after the expiration of the rate guarantee, Continental informed her that it was exercising its contractual right to raise premiums.  Plaintiff initiated this lawsuit, which claims that Continental committed common law fraud and violated the Consumer Fraud Act.  Plaintiff does not assert a breach of contract claim.

On August 18, 2015, this Court granted Continental's motion to dismiss plaintiff's First Amended Complaint.[1]  The Court first held that plaintiff failed to plead a claim of common law fraud because she did not allege that Continental made false statements or statements from which a fraudulent promise could reasonably be inferred, and because the allegedly false statements would not allow an inference of justifiable reliance.  August 18, 2015 Opinion and Order ("Opinion") at 5, 6 n.2.  Next, the Court dismissed plaintiff's claim for fraudulent omission because plaintiff had not alleged that Continental had a duty to disclose, whether based on being in a position of influence and superiority or based on having made statements that constitute "half-truths."  *Id.* at 7, 8.  The Court dismissed plaintiff's claim for unjust enrichment because

---

[1] Plaintiff originally filed this action against Continental and CNA Financial Corporation on January 8, 2015.  Defendants moved to dismiss, and in response plaintiff requested and was given leave to amend.

1

the First Amended Complaint alleged that a specific contract governed the relationship of the parties, and because the count alleging unjust enrichment included express allegations about that contract. *Id.* at 10. Finally, the Court dismissed plaintiff's consumer fraud claim because the First Amended Complaint did not plead a deceptive act or practice, especially given that Continental made clear that it had the right to raise premiums and "explicitly alerted [plaintiff] to the complained of result." *Id.* at 11, 12.[2]

Following this Court's rejection of all of plaintiff's claims, plaintiff submitted a Second Amended Complaint ("SAC") on September 11, 2015. This new complaint presents essentially the same claims for relief. The SAC contends that plaintiff was misled about the possibility and magnitude of premium increases through (1) an alleged misrepresentation that any increase would be limited to no more than 20% over the life of the policy and (2) a failure to disclose that the actuarial projections used to develop premium rates supposedly were inaccurate and that Continental would have to (and would be able to) raise premiums substantially at some undefined point in the future. *See* SAC ¶89, 116.

The SAC's additional allegations do not overcome the legal insufficiencies of the prior complaint. It contains is nothing to change the controlling facts, conceded by plaintiff, that she was told premiums could increase before she purchased the policy and that the policy so states in express language. Accordingly, plaintiff's most recent complaint fails for the same reasons as the last one. Like the previous complaint, the SAC does not plausibly allege that Continental made a false statement of material fact, that plaintiff reasonably relied on such a statement, that Continental had a duty to disclose, or that Continental engaged in a deceptive act or practice. In

---

[2] The Court also dismissed plaintiff's claim for negligent misrepresentation, because plaintiff did not allege a false statement of material fact and because she had not alleged that Continental had a duty to communicate accurate information. *Id.* at 8, 9. Plaintiff has not re-pleaded this claim.

2

addition, the SAC also explicitly alleges the existence of a contract within the count for unjust enrichment.

## II.     BACKGROUND: THE ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

Plaintiff, an Illinois resident, alleges that "[i]n and around 1998" Continental introduced the "Preferred Solution" long-term care policy. SAC ¶2. Plaintiff applied for the policy in mid-2002. *Id.* ¶37; *see also* Declaration of Jennifer Star (Exhibit 1) ("Star Dec.") at Exhibit A.[3] Her husband, Gregory Toulon, was the agent who sold her the policy. Ex. A to Star Dec. at 2, 6. On September 25, 2002, in connection with her purchase of the policy, plaintiff signed a "Long Term Care Insurance Personal Worksheet" (the "worksheet") provided by Continental. SAC ¶53; Ex. B to Star Dec. As explained in the worksheet, Illinois law required Continental to ask plaintiff to complete the worksheet. *Id.;* 50 Ill. Adm. Code 2012.123(c)(2) (2002). The contents of the worksheet also were prescribed by Illinois regulation. Ill. Adm. Code 2012.123(c)(2) (2002); 50 Ill. Adm. Code 2012.123.EXHF (2002).[4]

The worksheet advised plaintiff that Continental "has a right to increase premiums in the future" and asked questions regarding plaintiff's income and her ability to pay premiums if they were raised. SAC ¶54, 55; Ex. B to Star Dec. Continental included the question, "Have you considered whether you could afford to keep this policy if the premiums were raised, for example, by 20%?" SAC ¶55. This exact language, including the 20% figure, is set forth in the regulation.[5] Ex. 3. Plaintiff did not complete the questionnaire, instead checking a box stating "I

---

[3] The Star Declaration is attached to this Memorandum as Exhibit 1. The documents attached to the Star Declaration may be considered by the Court because they are referred to in the complaint and are central to the plaintiff's claims. *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

[4] The regulations in effect in 2002 are attached for the Court's convenience as Exhibits 2 and 3 to this memorandum, and also are available on Westlaw.

[5] Plaintiff asserts that Continental "elected" to include the question in the worksheet. SAC ¶55. The question is bracketed in the regulation. As with other bracketed statements, however, it would only make sense to include it if the policy were of the sort where premiums could be raised. *See* 50 Ill. Adm. Code 2012.123EXH F (2002) (Ex. 3). The Preferred Solutions policy was such a policy.

choose not to complete this information." Ex. B to Star Dec. Plaintiff also filled out an

"Authorization to Process Application" which stated that her agent, Mr. Toulon, had explained to

her the importance of filling out the worksheet, and confirmed that she wanted Continental to

continue to process her application although she had not filled it out. *Id.*

After receiving plaintiff's worksheet, Continental issued the policy and delivered it to

plaintiff on October 11, 2002. Ex. C and D to Star Dec. In bold capital letters, the first page of

the policy states: "**PREMIUMS SUBJECT TO CHANGE**." Ex. C to Star Dec. Under that

heading, the policy further explains: "We cannot change Your policy without Your consent.

However, We may change the premium rates. Any change will apply to all policies in the same

class as Yours in the state where the policy was issued." *Id.* The policy came with a 10-year rate

guarantee, locking the initial premium of $1,671.84 for a decade. SAC ¶95; Ex. B to SAC at 11.

It also came with a "Compound Automatic Increase Benefit Rider" that automatically increased

the amount of benefits by 5% each year to account for inflation, and a premium waiver provision

that meant that plaintiff would not be required to pay premiums if she went on claim. *Id.* at 15,

35. Eleven years after receiving her policy, plaintiff was notified that her premiums would be

increasing. SAC ¶59.

### 1. Misrepresentation Allegations

As with the previous complaint, the SAC continues to assert that Continental made five

statements in the worksheet that falsely implied that if the premiums were to increase, the

increase would be in the ballpark of 20%. SAC ¶89.[6] According to plaintiff, such statements

---

[6] This assertion continues to be based on "one or more" of the following statements in Continental's worksheet: 1) "The company has a right to increase premiums in the future;" 2) "The company has sold long term care insurance since 1965 and has sold this policy since 1998;" 3) "The company has not raised its rates for this policy;" 4) "However, the company did raise rates by 15% in 1995 on long term care policies sold seven to 12 years ago that provided essentially similar coverage;" 5) "Have you considered whether you could afford to keep this policy if premiums were raised, for example, by 20%?" *Id.* at ¶86.

were false when made because Continental knew that increases would occur in the future and knew these future increases would far exceed 20%. *Id.* at ¶86-89.

In addition, the SAC newly alleges that Continental made the following statements in a "Notice to Applicant Regarding The Long Term Care Insurance Personal Worksheet" (the "Notice to Applicant"): 1) "CNA has established some reasonable guidelines to help you in your considerations;" 2) "A rule of thumb that might be considered is that annual premiums in excess of 7% of your income or 3% of your assets may adversely affect your standard of living;" 3) "If you are buying this policy to protect your assets and your assets are less than $30,000, you may wish to consider other options for financing your long term care;" 4) "While the purchase of long term care insurance can help you maintain your independence, help preserve your assets, and give you more freedom of choice as to nursing home or other care providers, you would be ill advised to purchase any policy that would create a financial hardship for you;" and 5) "Your ability to pay the initial premium and renewal premiums must be taken into account in your decision to buy." SAC ¶85. Although plaintiff makes allegations about these "Notice to Applicant" statements under the heading "Count I - Fraudulent Misrepresentation," she does not expressly allege that they were false or misleading (instead, she continues to assert only that "one or more" of the statements made in the separate "Personal Worksheet" was false or misleading). *See* SAC ¶88.

The SAC adds the allegation that the statement "However, we may change premium rates" was a false statement of material fact because Continental knew that "there would be a certain and significant increase in premium rates in the future[.]" SAC ¶91-92. In addition, she alleges that the initial premium itself was a false statement. SAC ¶96.

### 2. Omission Allegations

According to the SAC, when Continental developed the policy in 1998, it concocted a scheme to intentionally under-price the policy by using "inflated, unreasonably optimistic lapse rates" to develop premiums and to extend 10-year rate guarantees so it "could artificially justify charging initial premiums that were initially affordable to target insureds." *Id.* ¶15-16. Continental then supposedly collected knowingly inadequate premiums for more than a decade, only to implement its plan eleven years later with the 76.50% rate increase – an increase that was somehow "known by CONTINENTAL at the time it issued the policy to plaintiff" to be certain to occur in the amount that was implemented. *Id.* ¶32. The SAC further claims that Continental knew that it "would be able to seek and obtain state regulatory approval for rate increases far in excess of 20%, including and beyond 76.5%." *Id.* ¶14.

The SAC rests its fraudulent omission claim on allegations that Continental had a duty to disclose to plaintiff that Continental would have to raise premiums substantially in the future and that the projected lapse rates used to develop premiums were inaccurate. *Id.* ¶110, 116. It alleges that Continental's duty to disclose arose because Continental held a "position of superiority and influence over insureds" like plaintiff. *Id.* ¶115. The SAC also alleges that statements made by Continental, including "The company has a right to increase premiums in the future," and "we may change the premium rates," created a duty to disclose because they were misleading "half-truths." *Id.* ¶120-22.

### 3. Consumer Fraud Act Allegations

The SAC asserts that Continental violated the Illinois Consumer Fraud and Deceptive Trade Practices Act (as well as the consumer fraud acts of the 49 other states and the District of Columbia). *Id.* ¶140. This claim is mainly based on the same allegations as the common law fraud claims: namely, that Continental knew when it priced and sold plaintiff's policy that it

6

would have to raise rates in the future, and that it intentionally used unrealistic actuarial assumptions in order to fraudulently induce plaintiff to purchase the policy. *Id.* ¶143, 164. In addition, the SAC also suggests that plaintiff's 10-year rate guarantee was part of Continental's ploy to collect premium payments for a period of time before raising rates. *See id.* ¶154. Finally, the SAC alleges that Continental committed "deception fraud" in violation of ICFA by failing to comply with 50 Ill. Adm. Code § 2012.123. This is based on the allegation that Continental did not include in the worksheet two questions about "inflation protection" and a request for acknowledgment of the worksheet's disclosures that are listed in Exhibit F to the regulation. SAC ¶160, 168.

## III.  LEGAL STANDARD

A complaint must contain sufficient factual matter to state a claim for relief that is both actionable as a matter of law and "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted). Under the heightened pleading standard of Rule 9(b), a plaintiff alleging fraud must state with particularity the circumstances of the alleged fraud. *Drobny v. J.P. Morgan Chase Bank, N.A.*, 929 F.Supp.2d 839, 844 (N.D. Ill. 2013).

## IV.  ARGUMENT

### A.  The Second Amended Complaint Does Not Allege Fraudulent Misrepresentation

A fraud claim requires plaintiff to allege and prove: (1) a false representation of a material past or existing fact; (2) that was known to be false when made; (3) that was made intentionally to induce plaintiff to act; (4) upon which plaintiff reasonably relied; and (5) the plaintiff was injured as a result of such reliance. *N. Am. Fin. Grp., Ltd. v. S.M.R. Enterprises, Inc.,* 583 F. Supp. 691, 697 (N.D. Ill. 1984). The SAC fails to allege these necessary elements.

The SAC bases its allegations of fraud on the following statements: 1) the five listed statements made in the worksheet; 2) the five listed statements made in the Notice to Applicant

that accompanied the worksheet; 3) the policy's statement "However, we may change the premium rates;" and 4) the initial premium itself. SAC ¶85, 86, 91, 96.

In dismissing plaintiff's previous complaint, this Court correctly determined that none of the five statements in the worksheet amounts to a false statement of material fact. Opinion at 5. That conclusion is still correct. Importantly, the SAC (like the previous complaint) does not even allege that any of these statements is untrue. *Id.* In addition, even if this were a case where a false promise of future performance could constitute fraud,[7] this Court was correct to conclude that the fraud alleged is not "the necessary or probable inference" from the five worksheet statements. *Id.*; *quoting Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996). Importantly, a fraudulent promise not to raise premiums in excess of 20% cannot reasonably be inferred from these statements because the hypothetical question regarding a 20% increase was copied directly from the Illinois Administrative Code section that describes the contents of the worksheet. Opinion at 5; Ex. 2, 3. This hypothetical question cannot "be read as a limit on [Continental's] discretion or a promise of any kind" (Opinion at 6), given that Continental advised plaintiff that it had the ability to raise premiums without qualification.[8]

Although plaintiff has pleaded the existence of some additional allegedly fraudulent statements to bolster her fraud claim, none of those new allegations overcomes the deficiencies in the claim. First, to the extent that plaintiff wishes to allege that the five statements in the "Notice to Applicant" were fraudulent (and it is not clear that she does, *see* SAC ¶85, 88), she again fails to allege that any of the individual statements was actually untrue. Second, each of

---

[7] It is not such a case. Financial predictions and promises regarding future conduct are not statements of "past or existing fact" that can form the basis of a fraud claim under Illinois law. *See N. Am. Plywood Corp. v. Oshkosh Trunk & Luggage Co.*, 263 F.2d 543, 545 (7th Cir. 1959).

[8] In addition, even if such a promise existed, it is not plausible to infer that plaintiff justifiably relied on such a promise given Continental's express disclosures, as well as her decision not to complete the worksheet. Opinion at 6, n. 2; *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 882 (7th Cir. 2005).

the "Notice to Applicant" statements incorporated into the SAC is merely a cautionary guideline intended to help people decide whether to purchase a long term care insurance policy, and constitutes an opinion not actionable in fraud. *Avon Hardware Co. v. ACE Hardware Corp.*, 998 N.E. 2d 1281, 1288 (Ill. App. 2013). Third, it is not plausible to conclude that Continental intended to deceive plaintiff by issuing these cautions. Two of the listed statements are closely modeled after, or identical to, statements that Continental was required to include (and did include) in the Personal Worksheet. These statements are: "A rule of thumb that might be considered is that annual premiums in excess of 7% of your income or 3% of your assets may adversely affect your standard of living;" and "If you are buying this policy to protect your assets and your assets are less than $30,000, you may wish to consider other options for financing your long term care." *Compare* Ex. 3 (2002 regulation) *to* Ex. B to Star Dec. (worksheet) *and* Ex. A to SAC (Notice to Applicant).

Next, plaintiff alleges that the statement, "However, We may change the premium rates" included on the first page of her insurance policy was fraudulent because Continental knew "with certainty, that … it would levy future, significant and substantial premium rate increases[.]" SAC ¶92. At the very least, this allegation is implausible: there is simply nothing in this disclosure about the right to change premium rates that could constitute a promise not to change premium rates. This point is reinforced by language on the same page of the policy, which states, in bold, capital letters: "**PREMIUMS SUBJECT TO CHANGE**." Ex. C to Star Dec. In addition, the SAC contains no basis for the allegation that Continental knew that it would have to raise premium rates in the future.[9]

---

[9] Although plaintiff describes certain actuarial studies and guidelines in the SAC, there is no allegation regarding whether they would have had any impact on or even applied to Continental's deliberations.

Finally, Plaintiff alleges that "The initial premium itself charged by CONTINENTAL was a false statement of material fact that was not calculated based on principles of actuarial science or industry-wide knowledge[.]"  SAC ¶96.  But Continental's statement about its premium was just that: a statement of the amount of the initial premium.  Plaintiff points to no statement by Continental that the premium was "calculated based on principles of actuarial science," let alone to any plausible allegation that such a statement would have been false.  In *Crichton v. Golden Rule Ins. Co*., 576 F.3d 392 (7th Cir. 2009), the Seventh Circuit held that by making statements about its premiums or describing its insurance as "group insurance" an insurer had not undertaken "to explain the 'whole truth' of its underwriting practices[.]"  *Id.* at 398.  Plaintiff's request that this Court conclude that the mere statement of an amount of premium amounts to a representation about the premium's underlying actuarial calculations cannot be made to comport with the holding of *Crichton*.

Because fraud is not the "necessary or probable inference" from any of allegations of plaintiff's complaint, plaintiff's fraudulent misrepresentation claim must be dismissed.  Opinion at 5 (*quoting Connick*, 675 N.E.2d at 591).

### B.  The Second Amended Complaint Does Not Allege Fraudulent Omission

Like the previous complaint, the SAC again alleges that Continental committed fraud through non-disclosure of material facts.  This claim requires plaintiff to allege that Continental had a duty to disclose a known material fact, concealed that fact with the intent to deceive plaintiff, and that plaintiff was unaware of the concealed fact and would have acted differently had she known about it.  *Noah v. Enesco Corp*., 911 F. Supp. 299, 303 (N.D. Ill. 1995).  Plaintiff has not adequately alleged these elements.

Although the SAC has added additional verbiage pertaining to Ms. Toulon's lack of experience in the domain of long-term care insurance and the actuarial science that was available to Continental (*see* SAC ¶100-111), it adds no additional substance to similar allegations in the previous complaint. Plaintiff continues to allege that a duty arose because she was 68 years old when she bought the policy, her highest level of education was high school, she had no knowledge of long-term care insurance, she placed her trust in Continental, and Continental made statements in the worksheet (and now, additionally, in the "Notice to Applicant") regarding considerations pertinent to whether plaintiff could afford the policy. *See* SAC ¶110-114; Opinion at 7. This Court has already correctly determined that "[t]hese allegations do not state a duty to disclose." *Id.* As this Court explained:

> If a fiduciary or special relationship were to arise from these allegations, it would also arise anytime an established insurer sold a policy to an elderly person who was not sophisticated in the ways of insurance and that insurer complied with Illinois's 'suitability' regulations. Such a holding would contradict Illinois's rule against insurers being fiduciaries as a matter of law.

Opinion at 7-8 (citations omitted).

Nor do plaintiff's allegations suffice to establish that a duty to disclose arose based on Continental having passed off "half-truths." According to the SAC, Continental's "half-truths" consisted of the following statements: 1) "However, we may change the premium rates;" and 2) "The company has a right to increase premiums in the future." SAC ¶120. As this Court correctly perceived, neither of the statements could possibly be a "half-truth" giving rise to a duty to disclose actuarial calculations and assumptions. The Seventh Circuit determined in *Crichton* that allegations comparable to these "do not remotely suggest that any of [the insurer's communications] purported to be an explanation of all of the underwriting factors that might affect [the insured's] insurance premiums." Opinion at 8 (quoting *Crichton*, 576 F.3d at 398).

11

In addition to failing to allege a duty to disclose, plaintiff also fails to plead her claims of fraudulent omission with adequate specificity. While the SAC lists general statistical data and actuarial principles allegedly pertaining to the calculation of long-term care insurance premiums, it does not even allege whether Continental considered those principles when developing its actuarial projections. SAC ¶7-9.[10] Nor does it allege that, if CNA had relied on those materials, they would have lead to a different premium or disclosures.[11] This failure to plead with the requisite specificity warrants dismissal. *In re Am. Consol. Transp. Companies, Inc*., 433 B.R. 242, 256 (Bankr. N.D. Ill. 2010) (dismissing fraud-based claims where it was "not plausible to conclude" from the plaintiff's allegations that the defendant actually had the knowledge plaintiff alleged). Finally, the fraudulent omission claim fails for the additional reason that it is grounded in future financial projections and opinions, which are not actionable as fraud under Illinois law. *See Tibor Mach. Products, Inc. v. Freudenberg-Nok Gen. P'ship*, No. 94 C 7635, 1996 WL 99896, at *5 (N.D. Ill. Feb. 29, 1996).

### C.  The Second Amended Complaint Does Not Allege Unjust Enrichment

This Court correctly determined that plaintiff's previous complaint failed to allege unjust enrichment because it included allegations of an express contract in the count for unjust enrichment. Opinion at 10. The SAC suffers from the same problem. *See* SAC ¶126-28. Because the SAC alleges in the unjust enrichment claim that a specific contract governs the

---

[10] Moreover, two of the three studies, the actuarial standards, and the model regulation were promulgated *after* Continental introduced the Preferred Solution policy in 1998, so the relevance of those materials is particularly unclear. *Id.*

[11] It should be noted that Continental was required to file its policy form and applicable rates with the Illinois Director of Insurance prior to issuing the policy to any Illinois resident. 215 ILCS 5/355; 50 Ill. Adm. Code 916.40 (1996).

relationship of the parties, the claim fails as a matter of law and must be dismissed. *Guinn v. Hoskins Chevrolet,* 836 N.E.2d 681, 704 (Ill. App. 2005).[12]

### D. The SAC Does Not Allege a Violation of the Consumer Fraud Act

The SAC also alleges that Continental violated the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA").[13] To establish an ICFA claim, "plaintiff must show that (1) defendant committed a deceptive act or practice; (2) defendant intended for plaintiff to rely on the deception; (3) the deception occurred in the course of conduct involving trade or commerce; (4) plaintiff suffered actual damages; and (5) plaintiff's damages were proximately caused by defendant's deceptive conduct." *DOD Technologies v. Mesirow Ins. Servs., Inc.*, 887 N.E.2d 1, 9 (Ill. App. 2008).

As with the previous complaint, the alleged deceptions underlying plaintiff's consumer fraud claim are the same as those underlying her claims for fraud. SAC ¶155, 164, 166, 168. She claims that Continental misrepresented that initial premium rates were determined based on principles of actuarial science, misrepresented the potential scope and certainty of premium increases, and intentionally used inflated lapse rates and other tactics to artificially decrease initial premiums. *Id.* ¶168.

Once again, plaintiff has not pleaded any deceptive act or practice in violation of ICFA, because the worksheet and policy made clear that Continental had the right to raise premiums. Opinion at 11. As the Seventh Circuit has explained, an ICFA claim "must be looked upon in

---

[12] The unjust enrichment claim should be dismissed for the independent reason that the related claims upon which it depends (those for common law fraud and violation of the consumer fraud act) are not viable. *See Enger v. Chicago Carriage Cab Co.*, 77 F. Supp. 3d 712, 718 (N.D. Ill. 2014).
[13] Although plaintiff attempts to allege a putative class action and claims that Continental violated the consumer fraud acts of 49 other states and the District of Columbia, the question on this motion to dismiss is whether she states a viable claim (*Tillman v. U.S. Energy Sav. Corp.*, No. 08 C 1641, 2008 WL 2754813, at *3 (N.D. Ill. July 14, 2008); thus, her consumer fraud claim should be analyzed under Illinois law, the only state to which plaintiff has any connection. *See* Opinion at 11.

light of the totality of the information made available to the plaintiff." *Davis*, 396 F.3d at 884. As with her previous complaint, plaintiff continues to be unable to point to any representation by Continental that premiums would not increase or would increase only between 15-20%, and in specifically alleges that Continental disclosed, in multiple ways, its rights to raise premiums. *See* SAC ¶89, 91. Because the "totality of circumstances" made Continental's rights to raise rates clear, plaintiff has not and cannot allege that Continental committed a deceptive act under ICFA.

The SAC additionally claims that Continental deceived her by offering a 10-year premium stabilization rider in order to induce her to buy the policy for a period of time, and by failing to make statements allegedly required under the applicable regulation, but none of these allegations establishes a deceptive act or practice under ICFA. As to the premium stabilization rider, plaintiff does not allege that Continental made any misrepresentation about the rider or that plaintiff got anything other than what she bargained for: a guarantee that there would be no premium increases for a decade. If anything, plaintiff's 10-year premium guarantee indicates that she was aware of the possibility that premiums could increase after the 10-year period. In addition, it is implausible to conclude that Continental would have chosen to lure plaintiff to purchase a policy with artificially low rates in hopes that she would abandon it later: plaintiff was 68 years old when she purchased the policy, had a ten-year rate lock guarantee, and would not have been required to pay premiums at all if she went on claim during that time. *See* Ex. B to SAC at 15, "Waiver of Premium Benefit").

Regarding the allegations that Continental did not make two statements regarding "inflation protection" and did not request an acknowledgment of the worksheet disclosures, *see* SAC ¶160, plaintiff does not allege that Continental failed to disclose that premiums could be increased – in fact, she alleges just the opposite. SAC ¶160, 163, 168. Thus, even if

Continental failed to make required representations about inflation protection or the request for acknowledgment of the disclosures (which Continental does not admit),[14] such failures would have no relation to the type of injury that plaintiff alleges. This is especially true given Continental's explicit disclosure of its right to raise premiums and plaintiff's election not to fill out the worksheet. Accordingly, these alleged failures do not plead the elements of an ICFA claim because there is no proximate cause linking them to plaintiff's alleged injury. *DOD Technologies*, 887 N.E.2d at 9 (proximate cause is required to establish an ICFA violation).

Finally, even if plaintiff could adequately plead the elements of an ICFA claim, her claim should nonetheless be dismissed because it is premised on representations in the worksheet that were authorized by law. ICFA provides a "safe harbor" for defendants whose actions were authorized by regulation. 815 ILCS 505/106(1); *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 54 (Ill. 2005).[15] Importantly, the hypothetical question regarding a 20% premium increase, to which plaintiff attributes a great deal of significance, is set forth verbatim in the regulation.[16] Ex. 3. Accordingly, the so-called "misrepresentations" challenged by plaintiff fall within ICFA's safe harbor provision, and her claim must be dismissed.

## V.    CONCLUSION

For the foregoing reasons, Continental requests that the Second Amended Complaint be dismissed with prejudice.

---

[14] Continental was required to file its personal worksheet with the Director of Insurance (*see* Ex. 2, 2012.123(2) (2002)), and plaintiff does not allege that Continental's worksheet was rejected by the Director. In addition, plaintiff's policy came with a "Compound Automatic Increase" rider that automatically increased her benefit by 5% every year, and plaintiff acknowledged in her application that "I have received…[a] Description of inflation protection[.]." *See* Ex. B to SAC at 35; Ex. A to Star Dec., at Section V.

[15] The Illinois Deceptive Trade Practices Act, 815 ILCS 510 *et seq*., provides a similar safe harbor. 815 ILCS 510/4(1).

[16] Notably, although plaintiff alleges that Continental was not required to make that statement because it is bracketed in the regulation, she does not allege that Continental was not authorized to make it by the regulation. SAC ¶55.

15

Dated: September 25, 2015

                                              CONTINENTAL CASUALTY COMPANY

                                              By: */s/ R. John Street*
                                              Michael L. McCluggage
                                              Brent R. Austin
                                              R. John Street
                                            EIMER STAHL LLP
                                              224 S. Michigan Avenue, Suite 1100
                                              Chicago, Illinois 60604
                                              (312) 660-7600
                                              *Attorneys for Defendant*

16

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 25, 2015, I caused a copy of the foregoing *Defendant's Memorandum In Support of Its Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)* to be filed electronically. Notice of this filing will be sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ R. John Street*
Attorney